

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-21-2007

# In Re: Myers

Precedential or Non-Precedential: Precedential

Docket No. 05-4882

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"In Re: Myers " (2007). 2007 Decisions. Paper 831.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/831

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No:  05-4882

IN RE: MARGARET J. MYERS,

Debtor

Margaret J. Myers,

Appellant

—————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No.: 04-cv-5282
District Judge: The Honorable Anita B. Brody
Bankruptcy Judge: The Honorable Bruce Fox

—————————

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 4, 2007

Before: SMITH, COWEN, and SILER, *Circuit Judges*[*]

—————————

[*]The Honorable Eugene E. Siler, Senior Circuit Judge for
the United States Court of Appeals for the Sixth Circuit, sitting

(Filed: June 21, 2007)

David A. Scholl
6 St. Albans Avenue
Newtown Square, PA 19073
*Counsel for Appellant*

Francis J. Sullivan
Hill Wallack
403 Executive Drive
Langhorne, PA 19047
*Counsel for Appellee*

---

OPINION OF THE COURT

---

SMITH, *Circuit Judge*.

Every now and then, we encounter an appeal where just about everyone appears to have behaved badly. Unfortunately, this is such a case.

In June 1999, Appellee-creditor Southern Medical Supply Co. ("SMS") obtained a $739,044.32 judgment in Georgia state court against Margaret Myers and her husband, Paul Myers, and

---

by designation.

2

two corporations owned by him, Alpha Technology and Micro Design. SMS then transferred the Georgia judgment to Bucks County, Pennsylvania, where Mr. and Mrs. Myers reside.

SMS also filed a lawsuit in the Bucks County Court of Common Pleas ("the CP Court") against Mr. Myers, Mrs. Myers, and Alpha Watch, Inc. ("AWI"), a corporation of which Mrs. Myers was the president and sole shareholder. All corporations owned by Mr. and Mrs. Myers sold "wander-control" patient-monitoring systems to nursing homes. The couple was involved in the operations of AWI and earned income from it. The CP Court suit alleged that the Myerses had fraudulently conveyed the assets of Mr. Myers's corporations, Alpha Technology and Micro Design, to AWI. On January 15, 2003, Mr. Myers filed a voluntary Chapter 7 bankruptcy petition and received a bankruptcy discharge.

On August 9, 2004, a bench trial began in the CP Court suit to decide SMS's fraudulent conveyance claim. Mrs. Myers and AWI were the only remaining defendants. On Wednesday, August 11, 2004, the trial judge in the CP Court suit stated that he would issue his judgment in open court on Friday, August 13. Mrs. Myers was not present in court for this announcement. However, the Bankruptcy Court concluded that Mr. Myers and his attorney, who were both present, believed that the CP Court intended to enter judgments against both AWI and Mrs. Myers and advised Mrs. Myers to therefore file for bankruptcy.

3

On Thursday, August 12, 2004, the day before the state court was to render its judgment, Mrs. Myers filed a bankruptcy petition under Chapter 13. Her counsel immediately informed SMS and the CP Court of the bankruptcy filing. Earlier that week, SMS had commenced an additional lawsuit in the CP Court against the Myerses and Stroll Control, Inc. ("SCI"), another corporation formed and owned by Mr. Myers. SMS sought to enjoin defendants from transferring any assets from AWI to SCI. A preliminary injunction hearing before the same state court was scheduled for August 13, 2004.

On Friday, August 13, 2004, the CP Court issued rulings in both suits against the Myerses and SCI. The Myerses did not attend the August 13 hearing, but their attorney was present and asserted that Mrs. Myers's bankruptcy filing the day before and Mr. Myers's prior bankruptcy filing prevented any judgment in the two lawsuits. The state court stated that it was aware of Mrs. Myers's bankruptcy filing, but that the bankruptcy stay only applied to matters against her in her individual capacity, not in her capacity as president of AWI. The CP Court ruled that Mr. and Mrs. Myers had transferred all of the assets of Alpha Technology and Micro Design to AWI with the intent to defraud SMS. Furthermore, the CP Court found that because AWI operated from the same location as the other two corporations, in the same business, with the same telephone numbers, and involving the same customers, it was appropriate to pierce the corporate veil of AWI and hold Mrs. Myers personally liable for the fraudulent conveyance. The CP Court entered judgments

4

against AWI and Mrs. Myers in the amount of the original Georgia state court judgment, plus interest, totaling $1,198,778.19. The CP Court decreed that judgment was entered against Mrs. Myers "in her corporate capacity, and will be [entered against her] in her individual capacity when the stay is lifted, in the similar amounts."

The CP Court also froze all of the assets of AWI and announced its intention to appoint a receiver for the corporation. The CP Court sanctioned the Myerses by awarding attorney's fees to SMS and referring the case for possible criminal sanctions. The CP Court entered nine orders. It (1) entered judgment against Mrs. Myers and AWI in the amount of $1,198,778.19; (2) placed Mrs. Myers's stock in AWI in a constructive trust in favor of SMS with the stock to be held by the state court; (3) froze the assets of AWI and enjoined defendants from transferring, selling or otherwise disposing of AWI's assets; (4) appointed a receiver for AWI; (5) assessed sanctions against defendants in the amount of $55,284.37; (6) directed Appellant-debtor to appear for a contempt hearing on August 16 due to her failure to appear in court on August 13; (7) enjoined SCI, as well as Mr. and Mrs. Myers, from transferring any assets already delivered from AWI to SCI; (8) appointed a receiver for SCI; and (9) enjoined Mr. and Mrs. Myers from owning, operating, investing in, or working for any entity involved in the business of patient monitoring.

Mr. and Mrs. Myers were not present in court to witness

5

these events. The Bankruptcy Court concluded that their attorney probably informed them of the state court's rulings, because on Saturday, August 14, 2004, Mr. Myers withdrew $6,000 from AWI's bank account and $1,184.10 (the entire balance) from SCI's account, in violation of the CP Court's orders. The Bankruptcy Court found that Mrs. Myers knew of these actions. The Bankruptcy Court also found that she appointed her husband vice-president of AWI, and that together they approved corporate bankruptcy filings of AWI and SCI. Mr and Mrs. Myers used the $6,000 withdrawn from the AWI account to pay state court counsel for AWI and Mrs. Myers, bankruptcy counsel for Mrs. Myers, and bankruptcy counsel for AWI and SCI.

SMS filed a motion to dismiss Mrs. Myers's bankruptcy case as filed in bad faith. Mrs. Myers sought to void the CP Court orders against her as violations of the automatic bankruptcy stay. Mrs. Myers also requested a temporary restraining order ("TRO") and preliminary injunction ("PI") enjoining SMS from enforcing the orders. The Bankruptcy Court issued a TRO preventing SMS from enforcing certain provisions of the CP Court's orders. SMS moved for relief from the automatic stay. The Bankruptcy Court consolidated SMS's motions to dismiss and for relief from the stay with Mrs Myers's motion for a PI.

Mrs. Myers duly filed her bankruptcy schedules and proposed Chapter 13 plan. She identified SMS as an unsecured

6

creditor holding a contingent, unliquidated, and disputed claim for $740,000. She stated that she and her husband had no income and proposed payments to the Chapter 13 trustee of $10 per month for three months. Mrs. Myers was current on all of her debts other than her obligations to SMS.

The CP Court scheduled a hearing to hold Mrs. Myers and her husband in civil contempt for violating its orders. Mrs. Myers filed a second motion for a TRO, asking the Bankruptcy Court to enjoin the CP Court contempt hearing as a violation of the automatic stay. Mrs. Myers and her husband were incarcerated for civil contempt by the CP Court until they could each pay $5,196 to counsel, at which point Mrs. Myers filed an addendum asking the Bankruptcy Court to order her release from custody.

The Bankruptcy Court did not address this motion or SMS's motion for relief from the automatic stay directly. On September 21, 2004, the Bankruptcy Court dismissed Mrs. Myers's case under 11 U.S.C. § 1307(c) as having been filed in bad faith. This dismissal effectively granted SMS relief from the automatic stay. Mrs. Myers filed a motion for reconsideration and to convert her case to Chapter 7, which the Bankruptcy Court denied.

Mrs. Myers timely appealed to the United States District Court for the Eastern District of Pennsylvania. The District Court affirmed both the dismissal of Mrs. Myers's bankruptcy

7

case and the Bankruptcy Court's refusal to convert the case to Chapter 7. The District Court, unlike the Bankruptcy Court, noted that the CP Court had violated the automatic stay by entering orders against Mrs. Myers, holding her in contempt, and incarcerating her. However, the District Court also held that these violations had been retroactively ratified by the annulment of the automatic stay. This appeal followed.

We have jurisdiction over this matter pursuant to 18 U.S.C. § 158(d) and 28 U.S.C. § 1291. "Because the district court acted as an appellate court in reviewing the final order of the bankruptcy court, our review of its determination is plenary. In reviewing the decision of the bankruptcy court, we exercise the same standard of review as the district court. Legal determinations are reviewed de novo. Factual determinations are reviewed under the clearly erroneous standard." *Sovereign Bank v. Schwab*, 414 F.3d 450, 452 n.3 (3d Cir. 2005) (citations omitted).

In support of reversing the Bankruptcy and District Courts, Mrs. Myers contends: (1) that the Bankruptcy Court abused its discretion by dismissing Mrs. Myers's bankruptcy case and refusing to convert it from Chapter 13 to Chapter 7; (2) that actions taken in violation of the automatic stay are void ab initio and must be set aside; and (3) that the Bankruptcy Court abused its discretion by retroactively annulling the automatic stay. We conclude that these arguments are without merit and will affirm the District Court.

8

**(1) The Bankruptcy Court did not abuse its discretion by dismissing Mrs. Myers's bankruptcy case and refusing to convert it from Chapter 13 to Chapter 7**

We review the Bankruptcy Court's decision to dismiss the bankruptcy case as a bad faith filing for abuse of discretion. *See In re SGL Carbon Corp.*, 200 F.3d 154, 159 (3d Cir. 1999). The determination of bad faith is "a fact intensive determination better left to the discretion of the bankruptcy court." *In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996). Accordingly, we will not set aside the Bankruptcy Court's factual findings unless they are clearly erroneous. *See id*.

A bankruptcy filing made in bad faith may be dismissed "for cause" under 11 U.S.C. § 1307(c), although § 1307(c) does not explicitly mention the good faith requirement. *See id*. The Bankruptcy Court looks to the totality of the circumstances to determine bad faith, and may consider a wide range of factors, including, "the nature of the debt . . . ; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors." *Id*.

The Bankruptcy Court noted five factors that supported its finding of bad faith: (1) that Mrs. Myers filed the petition after the CP Court announced its intention to rule, but just

9

before it did so; (2) that the filing was a tactic to prevent adverse rulings; (3) that SMS's state claim against Mrs. Myers was for fraudulent conveyance and represented the vast majority of her debt; (4) that Mrs. Myers allowed her husband to withdraw $6,000 from ACI's account, in violation of the CP Court's order, and used a portion of the funds to pay her bankruptcy counsel; and (5) that Mrs. Myers did not meet the requirements for filing a Chapter 13 petition.

Mrs. Myers is correct that a bankruptcy filing during the pendency of related state court litigation is not necessarily in bad faith. *See In re James Wilson Assocs.*, 965 F.2d 160, 170-71 (7th Cir. 1992). However, we have specifically held that suspicious timing of a bankruptcy petition is an appropriate factor for a court to consider in the bad faith analysis. *See In re Tamecki*, 229 F.3d 205, 208 (3d Cir. 2000). We have no doubt that Bankruptcy Courts may reasonably find that bad faith exists "where the purpose of the bankruptcy filing is to defeat state court litigation without a reorganization purpose." *In re Dami*, 172 B.R. 6, 10 (Bankr. E.D.Pa. 1994).

We cannot conclude that the Bankruptcy Court's second reason, that the bankruptcy filing was a mere tactic to prevent the adverse judgment, was clearly erroneous. The Bankruptcy Court is best positioned to assess the facts, particularly those related to credibility and purpose. *See Lilley*, 91 F.3d at 496. Even courts of appeals applying a narrow definition of bad faith have held that it is appropriate for a bankruptcy court to assess

10

the debtor's purpose and, if that purpose is to frustrate another court's jurisdiction, to consider it in the bad faith inquiry. *See, e.g.*, *In re Huckfeldt*, 39 F.3d 829, 832 (8th Cir. 1994). Indeed, this inquiry is inseparable from the bankruptcy courts' broad power to "decide whether the petitioner has abused the provisions, purpose, or spirit of bankruptcy law." *Tamecki*, 229 F.3d at 207.

Mrs. Myers argues that the Bankruptcy Court's third point, that the vast majority of her debt arose from an adverse judgment of fraudulent conveyance, is relevant only to whether the debt is ultimately dischargeable. This argument is without merit. We have specifically held that the bad faith inquiry properly includes consideration of the "nature of the debt," and "how the debt arose." *Lilley*, 91 F.3d at 496. That these factors are also relevant to dischargeability in no way dictates that they are excised from the bad faith analysis. We have also specifically held that "intention to avoid a large single debt" is properly a factor in the bad faith inquiry. *Tamecki*, 229 F.3d at 207.

Mrs. Myers also claims that the withdrawal of $6,000 from AWI's account, in violation of the CP Court's order, was innocent, as neither she nor her husband had notice of that order which had been issued the day before. The Bankruptcy Court found that, "in all probability," the Myerses did have actual notice of the CP Court's orders. Although we take issue with the Bankruptcy Court's formulation–it is the trial court's unique

11

obligation to find the facts, not to determine whether they are merely probable–we see no support for the position that this finding was clearly erroneous. Even if Mr. and Mrs. Myers had no actual notice of the CP Court's orders, the Bankruptcy Court could have reasonably concluded that this was deliberate ignorance that would have likewise been relevant to the bad faith inquiry.

Finally, Mrs. Myers attacks the Bankruptcy Court's conclusion that she was ineligible for Chapter 13 relief as she satisfied the requirements neither of "regular income," nor of "noncontingent, liquidated, unsecured debts of less than $307,675." 11 U.S.C. § 109(e). The Bankruptcy Court reasoned that Mrs. Myers knew that she was likely ineligible for Chapter 13 relief and filed the petition as a mere delaying tactic. As to the first requirement, Mrs. Myers and her husband argued that they could find employment, but they nevertheless listed their income as zero on their schedules and proposed initial payments of $10 per month to the Chapter 13 trustee. As to the second requirement, the Bankruptcy Court conducted a lengthy and learned analysis, echoed by the District Court, on the definitions of "contingent" and "liquidated." The Bankruptcy Court concluded that the judgment against Mrs. Myers, totaling more than one million dollars, was both noncontingent and liquidated. We need not repeat the analysis here. Even if Mrs. Myers could show that she was eligible for Chapter 13 relief on the date she filed her petition, this was but one of five factors that the Bankruptcy Court examined. We would not find that

12

the Bankruptcy Court had abused its discretion by dismissing Mrs. Myers's Chapter 13 case even if this fifth factor had never been mentioned.

Mrs. Myers also argues that the Bankruptcy Court erred by refusing to convert her Chapter 13 case to Chapter 7. *See* 11 U.S.C. § 1307(a) ("The debtor may convert a case under this chapter to a case under chapter 7 of this title at any time."). However, the decision whether to convert the case lies within the sound discretion of the Bankruptcy Court, just as does the decision whether to dismiss the case outright. *See Matter of Sullivan Central Plaza I. Ltd.*, 935 F.2d 723, 728 (5th Cir. 1991). Chapter 7 cases are subject to the same requirement of good faith as Chapter 13 cases. *See Tamecki*, 229 F.3d at 207. The Bankruptcy Court concluded that the same factors that indicated that Mrs. Myers filed her Chapter 13 cases in bad faith would apply with equal force to her Chapter 7 filing. The Bankruptcy Court was clear that Mrs. Myers's Chapter 13 case was not dismissed because she was ineligible, but because she lacked the requisite good faith intent. For the reasons already discussed, the Bankruptcy Court did not abuse its discretion by refusing to convert Mrs. Myers's case to Chapter 7.

### (2)  Actions taken in violation of the automatic stay are void, but ratifiable by annulment of the stay

A bankruptcy court has the authority to make exceptions to and to annul the automatic stay under 11 U.S.C. § 362(d).

13

Section 362(d) sets forth the grounds for relief from the stay. It provides that, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay [] for cause." 11 U.S.C. § 362(d), (d)(1).

Mrs. Myers argues that "it is well-established in this Circuit that actions taken in violation of the automatic stay, however innocently, are void ab initio and it is required that any judgment or other court action taken in violation of the stay must be set aside." We have indeed held that actions taken in violation of the stay are void. *See In re Siciliano*, 13 F.3d 748, 750 (3d Cir. 1994); *Raymark Indus., Inc. v. Lai*, 973 F.2d 1125, 1131 (3d Cir. 1992); *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991). However, this Court and others have held that actions in violation of the stay, although void (as opposed to voidable), may be revitalized in appropriate circumstances by retroactive annulment of the stay. *See Siciliano*, 13 F.3d at 750; *see also Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 976-77 (1st Cir. 1997).

Mrs. Myers's argument arises from semantic confusion, owing to the fact that the void-versus-voidable nomenclature is itself problematic. The term "voidable" implies that actions taken in violation of the stay are valid unless cancelled by some affirmative action, rather than invalid or dormant unless subsequently ratified. On the other hand, the term "void"

14

implies an absolute bar amenable to no exception. Therefore, this and other courts have held that actions in violation of the stay, although void, may nevertheless be reinvigorated through a retroactive annulment of the stay, see *Siciliano*, 13 F.3d at 750, *Mataya v. Kissinger (In re Kissinger)*, 72 F.3d 107, 109 (9th Cir. 1995), and still other courts have held such actions neither "voidable" nor "void," but "invalid" and subject to cure. *Easley v. Pettibone Michigan Corp.*, 990 F.2d 905, 909 (6th Cir. 1993).

An approach, however named, which allows for retroactive relief from the stay is necessary to preserve the meaning of the term "annulling" in 11 U.S.C. § 362(d), which states that courts may grant relief from the automatic stay "such as by terminating, annulling, modifying, or conditioning" the stay. The use of the term "annulling" would be redundant with "terminating" if courts were not empowered to grant retroactive relief. The semantic difference between the voidable and void-subject-to-exceptions approaches is not without consequence. *See Soares*, 107 F.3d at 976. However, both positions reject Mrs. Myers's absolutist approach. We reaffirm that actions in violation of the stay are void but retroactively ratifiable if the stay is annulled, as this conclusion gives courts flexibility to resolve conflicts involved in the resolution of significant claims and reflects the most logical interpretation of § 362(d) of the Bankruptcy Code and other statutes, such as 11 U.S.C. § 549(c), which allow for other forms of retroactive stay relief.

15

### (3) The Bankruptcy Court did not abuse its discretion by setting aside the automatic stay

SMS concedes that the CP Court committed two violations of the automatic stay. First, the CP Court entered orders against Mrs. Myers in her "corporate" capacity during the pendency of the stay. Second, the CP Court held Mrs. Myers in contempt of court and incarcerated her until she could pay $5,196 to counsel. *See In re Cherry*, 78 B.R. 65, 70 (Bankr. E.D.Pa. 1987) (holding that civil contempt proceedings are subject to the automatic stay). SMS does not dispute that the CP Court was promptly notified of Mrs. Myers's bankruptcy filing and the applicability of the automatic stay. Although the CP Court, not SMS, technically committed the violations of the stay, other courts have held that creditors have an affirmative duty to prevent violations of the automatic stay and may be held liable for passively failing to prevent such violations. *See, e.g.*, *Soares*, 107 F.3d at 978. In addition, Mrs. Myers contends that SMS actively urged the CP Court to violate the stay. As the District Court appropriately noted, SMS was not entitled to "take the law into its own hands" simply because it believed that Mrs. Myers's Chapter 13 petition was filed in bad faith. SMS could have sought emergency relief from the Bankruptcy Court. Instead, it encouraged the CP Court to violate federal law, a suggestion to which the CP Court proved amenable.

Whether to annul the automatic stay is a decision committed to the bankruptcy court's discretion, and may be

16

reversed only for abuse of that discretion. *See* 11 U.S.C. § 362; *In re Brown*, 311 B.R. 409, 412 (E.D.Pa. 2004). As discussed above, we have held that bankruptcy courts may retroactively ratify violations of the automatic stay by annulling the stay. *See In re Siciliano*, 13 F.3d at 751. Every court of appeals to consider the issue has held that whether the filing was in bad faith is relevant to whether the bankruptcy court should annul the automatic stay. *See, e.g.*, *Kissinger*, 72 F.3d at 109; *In re Albany Partners*, 749 F.2d 670, 674-75 (11th Cir. 1984).

SMS points to the Ninth Circuit's decision in *In re Kissinger*, 72 F.3d 107, as analogous to the instant case. In *Kissinger*, a lawyer filed for Chapter 11 protection right before a state court malpractice suit against him was to be submitted to the jury. *Id*. at 108. The state court ordered the trial to proceed in spite of the automatic stay. *Id*. The jury returned a $90,000 verdict against the lawyer. *Id*. The bankruptcy court found that the bankruptcy petition was filed in bad faith and retroactively ratified the judgment. *Id*. The Ninth Circuit observed:

> The bankruptcy court did not abuse its discretion in finding that retroactive relief was warranted. The court first found that there would have been cause to lift the stay prospectively at the time of the Chapter 11 filing because: the state court claim was sufficiently large such that it would have to be resolved before Kissinger could complete a reorganization; Kissinger was able to defend himself in the state court action; and

17

Kissinger's decision to file a Chapter 11 petition just before the state court action was to go to the jury appeared to be in bad faith. Additionally, the bankruptcy court found that there was additional cause to annul the stay retroactively to the time of the filing because: the failure to obey the stay was caused by the state court judge, not the creditor; and not annulling the stay would either lead to nonsensical results, by submitting the same case to the same jury that had just rendered a decision, or impose an unwarranted hardship on the creditors, since retrial would be costly.

*Kissinger*, 72 F.3d 109. This case is analogous, although not without differences. This case does not involve a jury. Moreover, the record raises the significant likelihood that the creditor actively encouraged the violation of the automatic stay. Nevertheless, the only effect of refusing to ratify the state court action would be to reward Mrs. Myers for her attempted abuse of the bankruptcy system. That, we will not do.

*Kissinger* and its antecedents persuasively argue that bankruptcy courts have "wide latitude in crafting relief from the automatic stay, including the power to grant retroactive relief from the stay" and lay out a non-exhaustive list of factors that the bankruptcy court may consider. *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 573 (9th Cir. 1992). However, there is "less appellate clarity" as to the appropriate "test for retroactive stay relief." *In re Fjelsted*, 293 B.R. 12, 21 (B.A.P. 9th Cir. 2003). Some cases have observed that relief is

18

appropriate only in "extreme circumstances," *Phoenix Bond & Indemnity Company v. Shamblin (In re Shamblin)*, 890 F.2d 123, 126 (9th Cir. 1989), while others have purported to give the court "wide latitude" to "balance[ ] the equities" on a case by case basis. *Nat'l Envtl. Waste Corp. v. City of Riverside (In re Nat'l Envtl. Waste Corp.)*, 129 F.3d 1052, 1054-55 (9th Cir. 1997). In *Shamblin*, the Ninth Circuit held that retroactive annulment of the stay is an "extraordinary action" and a "radical form of relief" that should be used "sparingly," but nevertheless allowed that retroactive annulment may be appropriate where the bankruptcy filing has been in bad faith. *Shamblin*, 890 F.2d at 126. Although the *Shamblin* Court reserved the question of "whether equitable principles may, in a proper case, justify retroactive annulment of the stay," the Ninth Circuit balanced the equities and determined that "equity favor[ed] enforcement rather than annulment of the stay." *Id*. at 126. Even those cases that have subscribed to a narrow conception of the power to retroactively annul the stay have affirmed that balancing the equities is the appropriate test.

Bearing that in mind, we cannot conclude that the Bankruptcy Court abused its discretion by retroactively annulling the stay in this case. Other courts have observed that the most important factors in making this determination are (1) whether the creditor was aware of the filing or encouraged violation of the stay; (2) whether the debtor engaged in inequitable, unreasonable, or dishonest behavior; and (3) whether the creditor would be prejudiced. *See, e.g.*, *Nat'l Envtl. Waste Corp.*, 129 F.3d at 1055. In effect, the Bankruptcy Court concluded that Mrs. Myers's manifestly dilatory tactics and the prejudice to SMS outweighed SMS's unclean hands in pushing

19

forward the CP Court orders in violation of the stay. We cannot say that this was an abuse of discretion, particularly given the wide latitude accorded to the Bankruptcy Court to balance the equities when granting relief from the automatic stay.

As we noted at the outset, the Bankruptcy Court was faced with rewarding the inequitable conduct of either the creditor or the debtor. We will not gainsay the Bankruptcy Court's resolution of this question. We note, however, that it is appropriate for the Bankruptcy Court to impose damages under 11 U.S.C. § 362(h) against any parties that created, encouraged, or actively participated in violations of the automatic stay, even if those violations are later ratified by annulment of the stay. *See In re Atlantic Bus. & Cmty. Corp.*, 901 F.2d 325, 328-29 (3d Cir. 1990).

We will affirm the judgment of the District Court.