Justice Scalia,
dissenting.
The Bankruptcy Code requires a debtor seeking relief under Chapter 13, unless he will repay his unsecured cred *525 itors in full, to pay them all of his “projected disposable income” over the life of his repayment plan. 11 U. S. C. § 1325(b)(1)(B). The Code provides a formula for “project-ting]” what a debtor’s “disposable income” will be, which so far as his earnings are concerned turns only on his past income. The Court concludes that this formula should not apply in “exceptional cases” where “known or virtually certain” changes in the debtor’s circumstances make it a poor predictor. Ante, at 513. Because that conclusion is contrary to the Code’s text, I respectfully dissent.
I
A
A bankruptcy court cannot confirm a Chapter 13 plan over the objection of the trustee unless, as of the plan’s effective date, either (1) the property to be distributed on account of the unsecured claim at issue exceeds its amount or (2) “the plan provides that all of the debtor’s projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.” § 1325(b)(1)(B). The Code does not define “projected disposable income,” but it does define “disposable income.” The next paragraph of § 1325(b) provides that “[f]or purposes of this subsection, the term 'disposable income’ means current monthly income received by the debtor,” excluding certain payments received for child support, “less amounts reasonably necessary to be expended” on three categories of expenses. § 1325(b)(2). The Code in turn defines “current monthly income” as “the average-monthly income from all sources that the debtor receives ... derived during the 6-month period ending on” one of two dates.[1] § 101(10A)(A). Whichever date applies, a debtor’s *526 “current monthly income,” and thus the income component of his “disposable income,” is a sum certain, a rate fixed once for all based on historical figures.
This definition of “disposable income” applies to the use of that term in the longer phrase “projected disposable income” in § 1325(b)(1)(B), since the definition says that it applies to subsection (b). Cf. § 1129(a)(15)(B) (referring to “the projected disposable income of the debtor (as defined in section 1325(b)(2))”). The puzzle is what to make of the word “projected.”
In the Court’s view, this modifier makes all the difference. Projections, it explains, ordinarily account for later developments, not just past data. Ante, at 513-514. Thus, the Court concludes, in determining “projected disposable income” a bankruptcy court may depart from § 1325(b)(2)’s inflexible formula, at least in “exceptional cases,” to account for “significant changes” in the debtor’s circumstances, either actual or anticipated. Ante, at 513.
That interpretation runs aground because it either renders superfluous text Congress included or requires adding text Congress did not. It would be pointless to define disposable income in such detail, based on data during a specific 6-month period, if a court were free to set the resulting figure aside whenever it appears to be a poor predictor. And since “disposable income” appears nowhere else in § 1325(b), then unless § 1325(b)(2)’s definition applies to “projected disposable income” in § 1325(b)(1)(B), it does not apply at all.
The Court insists its interpretation does not render § 1325(b)(2)’s incorporation of “current monthly income” a nullity: A bankruptcy court must still begin with that figure, but is simply free to fiddle with it if a “significant” change in *527 the debtor’s circumstances is “known or virtually certain.” Ante, at 513,519. That construction conveniently avoids superfluity, but only by utterly abandoning the text the Court purports to construe. Nothing in the text supports treating the definition of disposable income Congress supplied as a suggestion. And even if the word “projected” did allow (or direct) a court to disregard § 1325(b)(2)’s fixed formula and to consider other data, there would be no basis in the text for the restrictions the Court reads in, regarding when and to what extent a court may (or must) do so. If the statute authorizes estimations, it authorizes them in every case, not just those where changes to the debtor’s income are both “significant” and either “known or virtually certain.” Ibid. If the evidence indicates it is merely more likely than not that the debtor’s income will increase by some minimal amount, there is no reading of the word “projected” that permits (or requires) a court to ignore that change. The Court, in short, can arrive at its compromise construction only by rewriting the statute.
B
The only reasonable reading that avoids deleting words Congress enacted, or adding others it did not, is this: Setting aside expenses excludable under § 1325(b)(2)(A) and (B), which are not at issue here, a court must calculate the debt- or’s “projected disposable income” by multiplying his current monthly income by the number of months in the “applicable commitment period.” The word “projected” in this context, I agree, most sensibly refers to a calculation, prediction, or estimation of future events, see Brief for United States as Amicus Curiae 12-13 (collecting dictionary definitions); see also Webster’s New International Dictionary 1978 (2d ed. 1954). But one assuredly can calculate, predict, or estimate future figures based on the past. And here Congress has commanded that a specific historical figure shall be the basis for the projection.
*528 The Court rejects this reading as unrealistic. A projection, the Court explains, may be based in part on past data, but “adjustments are often made based on other factors that may affect the final outcome.” Ante, at 514. Past performance is no guarantee of future results. No gambler would bet the farm using “project[ions]” that are based only on a football team’s play before its star quarterback was injured. And no pundit would keep his post if he “projected” election results relying only on prior cycles, ignoring recent polls. So too, the Court appears to reason, it makes no sense to say a court “project[s]” a debtor’s “disposable income” when it considers only what he earned in a specific 6-month period in the past. Ante, at 513-514.
Such analogies do not establish that carrying current monthly income forward to determine a debtor’s future ability to pay is not a “projection.” They show only that relying exclusively on past data for the projection may be a bad idea. One who is asked to predict future results, but is armed with no other information than prior performance, can still make a projection; it may simply be off the mark. Congress, of course, could have tried to prevent that possibility by prescribing, as it has done in other contexts, that a debtor’s projected disposable income be determined based on the “best available evidence,” 8 U. S. C. § 1364(c)(2), or “any ... relevant information,” 25 U. S. C. § 2009(c)(1). But it included no such prescription here, and instead identified the data a court should consider. Perhaps Congress concluded that other information a bankruptcy court might consider is too uncertain or too easily manipulated. Or perhaps it thought the cost of considering such information outweighed the benefits. Cf. 7 U. S. C. § 1301(b)(13)(J)-(M) (requiring national and local “projected” yields of various crops to be adjusted only for abnormal weather, trends in yields, and production practices, apparently to the exclusion of other presumably relevant variables such as a sudden increase or decrease in the number of producers, farm subsidies, etc.). In all events, neither the reasons for nor the wisdom of the *529 projection method Congress chose has any bearing on what the statute means.
The Court contends that if Congress really meant courts to multiply a static figure by a set number of months, it would have used the word “multiplied,” as it has done elsewhere — indeed, elsewhere in the same subsection, see, e. g., 11 U. S. C. § 1325(b)(3) — instead of the word “projected.”[2] Ante, at 514-515. I do not dispute that, as a general matter, we should presume that Congress does not ordinarily use two words in the same context to denote the same thing. But if forced to choose between (1) assuming Congress enacted text that serves no purpose at all, (2) ascribing an unheard-of meaning to the word “projected” (loaded with made-to-order restrictions) simply to avoid undesirable results, or (3) assuming Congress employed synonyms to express a single idea, the last is obviously the least evil.
In any event, we are not put to that choice here. While under my reading a court must determine the income half of the “projected disposable income” equation by multiplying a fixed number, that is not necessarily true of the expenses excludable under § 1325(b)(2)(A) and (B). Unlike the debt- or’s current monthly income, none of the three types of expenses — payments for the support of the debtor and his dependents, charitable contributions, and expenses to keep an existing business above water — is explicitly defined in terms of historical figures (at least for debtors with incomes below the state median). The first of those cannot possibly (in many cases) be determined based on the same 6-month period from which current monthly income is derived,* ***[3] and the *530 texts of the other two are consistent with determining expenses based on expectations. See § 1325(b)(2)(A)(ii) (charitable expenses to qualified entities limited to “15 percent of gross income of the debtor for the year in which the contributions are made”); § 1325(b)(2)(B) (“expenditures necessary for the continuation, preservation, and operation” of a business in which the debtor is engaged).
In short, a debtor’s projected disposable income consists of two parts: one (current monthly income) that is fixed once for all based on historical data, and another (the enumerated expenses) that at least arguably depends on estimations of the debtor’s future circumstances. The statute thus requires the court to predict the difference between two figures, each of which depends on the duration of the commitment period, and one of which also turns partly on facts besides historical data. In light of all this, it seems to me not at all unusual to describe this process as projection, not merely multiplication.
C
The Court’s remaining arguments about the statute’s meaning are easily dispatched. A “mechanical” reading of projected disposable income, it contends, renders superfluous the phrase “to be received in the applicable commitment period” in § 1325(b)(1)(B). Ante, at 517. Not at all. That phrase defines the period for which a debtor’s disposable income must be calculated (i. e., the period over which the projection extends), and thus the amount the debtor must ultimately pay his unsecured creditors.
Similarly insubstantial is the Court’s claim regarding the requirement that the plan provide that the debtor’s projected disposable income “will be applied to make payments” toward unsecured creditors’ claims, § 1325(b)(1)(B). The Court says this requirement makes no sense unless the *531 debtor is actually able to pay an amount equal to his projected disposable income. Ante, at 518-519. But it makes no sense only if one assumes that the debtor is entitled to confirmation in the first place; and that assumption is wrong. The requirement that the debtor pay at least his projected disposable income is a prerequisite to confirmation. The “will be applied” proviso does not require a debtor to pay what he cannot; it simply withholds Chapter 13 relief when he cannot pay.
The Court also argues that § 1325(b)(l)’s directive to determine projected disposable income “as of the effective date of the plan” makes no sense if mere multiplication of existing numbers is required. Ante, at 518. As I have explained, however, “projected disposable income” may in some cases require more than multiplication (as to expenses), and the estimations involved may vary from the date of the plan’s filing until the date it takes effect. Moreover, the provision also applies to the alternative avenue to confirmation in § 1325(b)(1)(A), which requires that “the value of the property to be distributed under the plan” to an unsecured creditor equals or exceeds the creditor’s claim. As to that requirement, the effective-date requirement makes perfect sense.
Text aside, the Court also observes that Circuit practice prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), 119 Stat. 23, aligns with the atextual approach the Court adopts today. Ante, at 515-517. That is unsurprising, since the prior version of the relevant provisions was completely consistent with that approach. The Court is correct that BAPCPA “did not amend the term ‘projected disposable income,’ ” ante, at 517. But it did amend the definition of that term. Before 2005, § 1325(b)(2) defined “disposable income” simply as “income which is received by the debtor and which is not reasonably necessary to be expended” on the same basic types of expenses excluded by the current statute. § 1325(b)(2) (2000 *532 ed.). Nothing in that terse definition compelled a court to rely exclusively on past data, let alone a specific 6-month period. But in BAPCPA — the same Act in which Congress defined “current monthly income” in §101(10A)(A) — Congress redefined “disposable income” in § 1325(b)(2) to incorporate that backward-looking definition. See Pub. L. 109-8, § 102(b), (h), 119 Stat. 32-34. Given these significant changes, the fact that the Court’s approach conforms with pre-BAPCPA practice not only does not recommend it, see, e. g., Pennsylvania Dept. of Public Welfare v. Davenport, 495 U. S. 552, 563-564 (1990), but renders it suspect.
II
Unable to assemble a compelling case based on what the statute says, the Court falls back on the “senseless results” it would produce — results the Court “do[es] not think Congress intended.” Ante, at 520. Even if it were true that a “mechanical” reading resulted in undesirable outcomes, that would make no difference. Lewis v. Chicago, ante, at 217. For even assuming (though I do not believe it) that we could know which results Congress thought it was achieving (or avoiding) apart from the only congressional expression of its thoughts, the text, those results would be entirely irrelevant to what the statute means.
In any event, the effects the Court fears are neither as inevitable nor as “senseless” as the Court portrays. The Court’s first concern is that if actual or anticipated changes in the debtor’s earnings are ignored, then a debtor whose income increases after the critical 6-month window will not be required to pay all he can afford. Ante, at 520. But as Lanning points out, Brief for Respondent 22-23, Chapter 13 authorizes the Bankruptcy Court, at the request of unsecured creditors, to modify the plan “[a]t any time after confirmation” to “increase . . . the amount of payments” on a class of claims or “reduce the time for such payments.” § 1329(a)(l)-(2) (2006 ed.). The Court offers no explanation *533 of why modification would not be available in such instances, and sufficient to resolve the concern.
The Court also cringes at the prospect that a debtor whose income suddenly declines after the 6-month window or who, as in this case, receives a one-off windfall during that window, will be barred from Chapter 13 relief because he will be unable to devote his “disposable income” (which turns on his prior earnings) to paying his unsecured creditors going forward. Ante, at 520-521. At least for debtors whose circumstances deteriorate after confirmation, however, the Code already provides an answer. Just as a creditor can request an upward modification in light of postconfirmation developments, so too can a debtor ask for a downward adjustment. § 1329(a). Cf. § 1329(b)(1) (requiring that modifications meet requirements of §§ 1322(a)-(b), 1323(c), and 1325(a), but not § 1325(b)).
Moreover, even apart from the availability of modification it requires little imagination to see why Congress might want to withhold relief from debtors whose situations have suddenly deteriorated (after or even toward the end of the 6-month window), or who in the midst of dire straits have been blessed (within the 6-month window) by an influx of unusually high income. Bankruptcy protection is not a birthright, and Congress could reasonably conclude that those who have just hit the skids do not yet need a reprieve from repaying their debts; perhaps they will recover. And perhaps the debtor who has received a one-time bonus will thereby be enabled to stay afloat. How long to wait before throwing the debtor a lifeline is inherently a policy choice. Congress confined the calculation of current monthly income to a 6-month period (ordinarily ending before the case is commenced), but it could have picked 2 or 12 months (or a different end date) instead. Whatever the wisdom of the window it chose, we should not assume it did not know what it was doing and accordingly refuse to give effect to its words.
*534 Even if one insists on making provision for such debtors, the Court is wrong to write off four alternative strategies the trustee suggests, Brief for Petitioner 50-54:
• Presumably some debtors whose income has only recently been reduced, or who have just received a jolt that causes a temporary uptick in their average income, can delay-filing a Chapter 13 petition until their “current monthly income” catches up with their present circumstances. The Court speculates that delay might “giv[e] the appearance of bad faith,” ante, at 522 (citing § 1325(a)(7)), but it offers no explanation of why that is so, and no authority supporting it.[4]
• Even if bad faith were a real worry, or if it were essential to a debtor’s prospects that he invoke § 362’s automatic stay immediately, the debtor might ask the bankruptcy court to excuse him from filing a statement of current income, so that it determines his “current monthly income” at a later date. See § 101(10A)(A)(ii). The Court dismisses this alternative, explaining that if the Code requires a mechanical approach this solution would “improperly undermine” it, and if the Code allows exceptions for changed circumstances the solution is unnecessary. Ante, at 522. The second premise is correct, but the first is not. Congress does not pursue its purposes at all costs. Rodriguez v. United States, 480 U. S. 522, 525-526 (1987) (per curiam). Here it may have struck the very balance the Court thinks critical by creating a fixed formula but leaving leeway as to the time to which it applies.[5]
*535 * A debtor who learns after filing that he will be unable to repay his full projected disposable income might also be able to dismiss his case and refile it later. § 1307(b). The Court worries that this alternative also might be deemed abusive, again with no pertinent authority for the speculation.* ****[6] Its concern is based primarily on its belief that this “circumvents the statutory limits on a court’s ability to shift the lookback period.” Ante, at 523. That belief is mistaken, both because the Court exaggerates the statutory limitations on adjusting the lookback period, and because, just as it does not defeat the disposable-income formula’s rigidity to allow adjustments regarding the time of determining that figure, it would not undermine the limitations on adjustment applicable in a pending case to allow the debtor to dismiss and refile.[7]
*536 • A debtor unable to pursue any of these avenues to Chapter 13 might still seek relief under Chapter 7. The Court declares this cold comfort, noting that some debtors — including Lanning — will have incomes too high to qualify for Chapter 7. Ante, at 523-524. Some such debtors, however, may be able to show “special circumstances,” § 707(b)(2)(B), and still take advantage of Chapter 7. Aside from noting the absence of authority on the issue, the Court’s answer is un-satisfyingly circular: It notes that the special-circumstances exception is available only if the debtor has “no reasonable alternative,” § 707(b)(2)(B)(i), which will not be true after today given the Court’s holding that bankruptcy courts can consider changes in a debtor’s income. As for those who cannot establish special circumstances, it is hard to understand why there is cause for concern. Congress has evidently concluded that such debtors do not need the last-ditch relief of liquidation, and that they are not suitable candidates for repaying their debts (at least in part) under Chapter 13’s protective umbrella. We have neither reason nor warrant to second-guess either determination.
* * *
Underlying the Court’s interpretation is an understandable urge: Sometimes the best reading of a text yields results that one thinks must be a mistake, and bending that reading just a little bit will allow all the pieces to fit together. But taking liberties with text in light of outcome makes sense only if we assume that we know better than Congress which outcomes are mistaken. And by refusing to hold that Congress meant what it said, but see Connecticut Nat. Bank v. Germain, 503 U. S. 249, 253-254 (1992), we deprive it of the *537 ability to say what it means in the future. It may be that no interpretation of § 1325(b)(1)(B) is entirely satisfying. But it is in the hard cases, even more than the easy ones, that we should faithfully apply our settled interpretive principles, and trust that Congress will correct the law if what it previously prescribed is wrong.
I respectfully dissent.

 If the debtor files a schedule of current income, as ordinarily required by § 521(a)(l)(B)(ii), then the 6-month period ends on the last day of the month preceding the date the case is commenced, § 101(10A)(A)(i) — that *526 is, when the petition is filed, §§301(a), 302(a), 303(b). If the debtor does not file such a schedule on time — which the bankruptcy court apparently may excuse him from doing, § 521(a)(l)(B)(ii) — the 6-month period ends on the date the bankruptcy court determines the debtor’s current income. § 101(10A)(A)(ii).

 Of course, since the number of months in the commitment period may vary, Congress could not simply have substituted a single word, but would have had to write “disposable income multiplied by the number of months in the applicable commitment period” or some such phrase.

 For a debtor whose income is below the state median, excludable expenses include domestic-support obligations “that first becom[e] payable after the date the petition is filed,” § 1325(b)(2)(A)(i) — that is, after the 6-month window relevant to the debtor's current monthly income has *530 closed (unless the debtor does not file a current-income schedule), see § 101(10A)(A)(i).

 Neither of the two Court of Appeals cases the Court cites — In re Myers, 491 F. 3d 120, 125 (CA3 2007), and Neufeld v. Freeman, 794 F. 2d 149, 153 (CA4 1986) — involved a debtor’s delaying his petition until his circumstances would permit the court to confirm a repayment plan.

The Court observes that not every debtor will benefit from this exception, ante, at 522, and n. 6, since § 521(i)(3) provides that a bankruptcy court may not grant a request (which may be made after the deadline for filing the current-income schedule) for an extension of more than 45 days to file such a schedule. But the statute appears to assume that a court may excuse the filing of such a schedule altogether: A debtor is required to file a schedule in the first instance “unless the court orders otherwise,” *535 § 521(a)(1)(B) (emphasis added). And § 101(10A)(A)(ii)'s provision of a method for calculating current monthly income “if the debtor does not file the schedule of current income required by section 521(a)(l)(B)(ii)” makes little sense unless a court can excuse the failure to do so, since an unexcused failure to do so would be a basis for dismissing the case, see § 521(i). Allowing courts to excuse such schedules does not render superfluous §521(i)(3)’s authorization for limited extensions, since that applies to extensions sought up to 45 days after the filing deadline, whereas § 521(a) (1)(B) seems to apply only before the deadline.

 The sole authority the Court supplies — a single Bankruptcy Court decision predating BAPCPA — provides no support. See In re Glenn, 288 B. R. 516,519-521 (ED Tenn. 2002). Although acknowledging that “[m]ultiple filings by a debtor are not, in and of themselves, improper,” the court did note that “whether this is the first or subsequent filin[g]” by the debtor is one among the “totality of the circumstances” to be considered in a good-faith analysis. Id., at 520 (internal quotation marks omitted). The debtor in the case at hand had filed three previous Chapter 13 petitions, “each on the eve of a scheduled foreclosure,” and according to the court “never had any intention of following through with any of the Chapter 13 cases,” but had used the bankruptcy process “to hold (his creditor] hostage, while remaining in his residence without paying for it.” Id., at 520-521.

 The Court also notes that the Code precludes a debtor who has had a case pending in the last 180 days from refiling if his prior case was dismissed because he willfully failed to obey the court’s orders or to appear *536 before the court, § 109(g)(1), or if he voluntarily dismissed the prior suit “following the filing of a request for relief from the automatic stay” under § 362, § 109(g)(2). Ante, at 523, n. 7. But the Court does not explain why these barriers have any bearing on whether refiling for bankruptcy would be abusive when the barriers do not apply.