**FIDELITY BOND AND MORTGAGE COMPANY,**

v.

**Steven D. BRAND, et al.**

**Civil Action No. 06–2127.**

United States District Court, E.D. Pennsylvania.

July 18, 2007.

James M. Matour, Sharon F. McKee, William T. Hangley, Hangley Aronchick Segal & Pudlin, Philadelphia, PA, for Fidelity Bond and Mortgage Company.

David L. Braverman, John E. Kaskey, Braverman Daniels Kaskey Ltd., Philadelphia, PA, for Steven D. Brand, James M. Dougherty, Arthur L. Powell, Richard S. Powell, Jon R. Powell, Carol P. Heller, Nancy E. Powell, Harold G. Schaeffer, James R. Schaeffer, Anthony L. Schaeffer, Robert D. Schaeffer.

Michelle S. Walker, Braverman Daniels Kaskey Ltd., Philadelphia, PA, for Steven D. Brand, James M. Dougherty, Arthur L. Powell, Jon R. Powell, Carol P. Heller.

## MEMORANDUM OPINION

SAVAGE, District Judge.

This bankruptcy appeal presents the issue of who—the creditor or the grantee—has the burden of proof in a constructive fraud action under the Pennsylvania Uniform Fraudulent Transfer Act[1] ("PUFTA")—a question that has not been decided by the Pennsylvania courts or the Third Circuit. Fidelity Bond and Mortgage Company ("Fidelity") challenges the Bankruptcy Court's placing the burden on Fidelity by a preponderance of the evidence rather than on the defendants to prove by clear and convincing evidence that Fidelity had been left with too few assets to run the business and was unable to pay its debts as they became due, rendering them fraudulent transfers under the PUFTA.

The dispute centers on Fidelity's giving the defendants, then Fidelity's sole shareholders, $1,705,000 in cash and $1,200,000 in promissory notes immediately prior to its merger with another mortgage banking company. In an adversary proceeding in the Bankruptcy Court, Fidelity Bond and Mortgage Company[2] sought to avoid and recover the cash distribution and the promissory notes. Fidelity asserted that the cash distribution and promissory notes left Fidelity with too few assets to run the business and unable to pay its debts as they became due, rendering them fraudulent transfers under the PUFTA. Fidelity also claimed that in taking the cash distribution and promissory notes, the shareholders of Fidelity had breached their fiduciary duty to the company in violation of the Pennsylvania Business Corporation Law of 1988, 15 Pa.C.S.A. §§ 1551 and 1553.

The Bankruptcy Court determined that although Fidelity had not received reasonably equivalent value for the distribution, Fidelity had failed to prove that it had been left with unreasonably small assets and was unable to pay its debts. Because the Bankruptcy Court correctly concluded, as a matter of law, that Fidelity had the burden of proving, by a preponderance of the evidence, all of the elements of its

---

1. 12 Pa.C.S.A. § 5101, *et seq.*

2. Fidelity Bond and Mortgage Company will be referred to as "Fidelity." At times, to distinguish the company from before the merger, it is identified as "New Fidelity."

constructive fraud claims brought under the PUFTA, and its factual findings are supported by the record, the Bankruptcy Court's decision will be affirmed.

## I. Background

Before the merger, Fidelity and Phoenix Mortgage Co. ("Phoenix") were mortgage banking companies that engaged in the origination, purchase, sale and servicing of mortgage loans. The companies had different emphases. Phoenix was engaged primarily in origination, underwriting and funding of mortgage loans. Fidelity concentrated on mortgage servicing, that is, collecting mortgage payments and remitting them, after deducting a fee, to the mortgage holder.

A mortgage servicer's primary asset is the right to collect payments from borrowers. Consequently, as loans are paid off or defaulted upon, the value of a mortgage servicing portfolio diminishes. To continue earning fees, a mortgage servicer must offset the decrease by replenishing its portfolio of mortgage servicing rights by buying mortgages, buying mortgage servicing rights from the owners of mortgages or other servicers, or originating mortgages that it can service.

Because lower interest rates tend to increase the rate of new home buying and refinancing, they instigate mortgage originations. On the other hand, low interest rates tend to hurt mortgage servicing portfolios because refinancings through different lenders who are serviced by others eliminate mortgages in the portfolios. Thus, when interest rates decrease, a mortgage servicer that has a strong mortgage origination affiliate may increase its servicing portfolio when the affiliate generates more new mortgages than the number of mortgages refinanced out of the servicing portfolio.

Approximately a year before the merger, First Republic Bank ("First Republic") proposed acquiring Fidelity and merging it with a mortgage origination company to create a mortgage banking entity that would engage in the business of jointly originating, selling and servicing residential mortgage loans. The concept was a marriage of complementary companies, Fidelity and Phoenix, to assure stability.

On January 7, 1998, Fidelity, Phoenix and First Republic executed a letter of intent, outlining the structure of the proposed transaction and the bases of the parties' understanding concerning the negotiations of a final agreement. The agreement executed by the parties, dated May 1, 1998, incorporated the terms of the letter of intent and effectuated the merger.

First Republic and the Phoenix shareholders formed FBMC Acquisition Co. ("FBMC"). First Republic contributed $1,645,000 in cash; the Phoenix shareholders, 100% of their stock; and Phoenix shareholder Ronald White, $70,000 in cash. Phoenix became a wholly owned subsidiary of FBMC.

FBMC used the $1,715,000 to purchase 80% of Fidelity's outstanding common stock from the defendants and gave them 20% of the common stock of FBMC in exchange for the remaining 20% of Fidelity stock. The defendants also received $1,200,000 in promissory notes from FBMC.[3]

Fidelity became a wholly owned subsidiary of FBMC, and Phoenix was merged into Fidelity. FBMC's stock was distributed as follows: 47% to First Republic; 31% to former Phoenix shareholders; 20% to the defendants; and 2% to Ronald White.[4]

---

**3.** On May 1, 1998, New Fidelity became a co-obligor on the promissory notes.

**4.** The parties intended ultimately to merge Fidelity and FBMC, but it never happened.

On April 28, 1998, as a condition precedent to the merger, Fidelity entered into a Revolving Credit and Term Loan Agreement with Summit Bank, the obligations of which were assumed by the new Fidelity. Summit provided New Fidelity with a term loan of $7 million and extended a $500,000 working capital line of credit, secured by New Fidelity's mortgage servicing rights and certain other assets.

Two covenants were part of this loan arrangement. The first, the Paragraph 2(e) loan-to-value covenant, provided that if, at anytime prior to December 31, 1998, the outstanding principal balance of the term loan exceeded 85% of the value of New Fidelity's mortgage servicing portfolio ("portfolio valuation"), New Fidelity would have to immediately pay down the term loan to bring it into compliance with the 85% ratio. The ratio was set to reduce to 80%, starting in 1999. The second loan-to-value covenant, Paragraph 6(p)(4), provided that the outstanding principal balance of the term loan plus the $500,000 revolving line of credit could not exceed 85% of the portfolio valuation.

For purposes of determining compliance with the loan covenants, the portfolio valuation was calculated by multiplying the unpaid principal balance of the mortgages in the servicing portfolio by a multiplier dictated by Summit. The market value of the loan servicing portfolio was fixed by a third party evaluator hired by Fidelity, Prestwick Mortgage Group. Summit submitted this third-party portfolio evaluation to its own outside experts who reviewed the reasonableness of the assumptions underlying the evaluation and provided its range of multipliers to Summit, which then selected a multiplier from that range. The unpaid principal balance of the loans in the loan-servicing portfolio was then multiplied by the multiplier.

The agreement provided that at closing New Fidelity would have $1,000,000 on hand to operate, consisting of $500,000 in cash and a $500,000 working capital line of credit. It also allowed Fidelity, immediately prior to closing, to distribute to its shareholders all but $500,000. Accordingly, on April 30, 1998, Fidelity distributed $1,705,000 in cash dividends to its shareholders, the defendants.

On the day of the merger, New Fidelity had $611,918 in cash. It immediately dispersed $300,000 as follows: $70,000 for Summit's loan origination fee; $130,000 for Phoenix's pre-merger payroll; and $70,000 to bring Phoenix's escrows into compliance with federal guidelines. Thus, New Fidelity's available cash was reduced to $311,918.

In the months following the merger, the loan servicing portfolio's unpaid principal balance decreased at a higher rate than had been anticipated, accounting for $1,074,000 of New Fidelity's losses between May 1 and December 31, 1998. As a consequence, shortly after the merger, New Fidelity was not in compliance with the loan covenants, shutting down access to the $500,000 line of credit with Summit.

On September 28, 1998, the Summit loan agreement was amended to remove the $500,000 line of credit factor from the calculation of the Paragraph 6(p)(4) Loan–to–Value Covenant. Nonetheless, because Summit used a lower figure than had been anticipated to determine the portfolio's valuation, Fidelity was out of compliance with the Paragraph 2(e) Loan Covenant by $283,509. Finally, on December 22, 1998, Summit Bank declared the loan in default.

In December of 1998, Fidelity attempted to sell the company to Keystone Bank. In February of 1999, Keystone proposed purchasing almost all of New Fidelity's assets for about $10 million. First Republic essentially scuttled the chances of a deal,

resulting in Keystone's withdrawing its offer in April of 1999.

On July 6, 1999, Fidelity filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.

## II. Proceedings in the Bankruptcy Court

After filing for reorganization, Fidelity instituted an adversary proceeding on behalf of its creditors to avoid and recover the cash distribution to the defendants, and to avoid any obligation for the promissory notes, contending that the distribution and the promissory notes were fraudulent transfers under the constructive fraud provisions of §§ 5104(a) and 5105 of the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"). It also claimed that the defendants breached their fiduciary duty to the company in violation of §§ 1551 and 1553 of the Pennsylvania Business Corporation Law. Alternatively, Fidelity sought to recharacterize or equitably subordinate the promissory notes pursuant to § 510 of the Bankruptcy Code.

After a trial that consumed 33 days over a two-year period and included hundreds of exhibits and extensive expert testimony, the Bankruptcy Court issued an opinion containing detailed factual findings and conclusions of law. It granted judgment in favor of Fidelity on one of its claims, recharacterizing the promissory notes as equity. On Fidelity's fraudulent transfer claims, the Bankruptcy Court held that the distribution and promissory notes constituted a transfer and an obligation, respectively, under the PUFTA,[5] and that Fidelity did not receive reasonably equivalent value for them;[6] but, it concluded that Fidelity had failed to prove either that the company was insolvent at the time of the merger, had insufficient assets to conduct its business, intended to incur or believed that it would incur debts beyond its ability to pay them, or was unable to pay its debts as they became due. Therefore, the Bankruptcy Court concluded that neither the cash distribution nor the promissory notes were fraudulent transfers.

## III. Issues on Appeal

■ Fidelity argues that the Bankruptcy Court erroneously placed the burden of proof of proving all elements of its fraudulent transfer claim on Fidelity rather than the defendants. Fidelity contends that, instead, the defendants should have had the burden to prove, by clear and convincing evidence, that Fidelity had not been left with unreasonably small assets or had been able to pay its debts as they became due after the transfer. This issue is subject to plenary review.[7]

5. Specifically, the Bankruptcy Court held that the distribution falls within the definition of a "transfer" in the statute because it constituted the "payment of money" from Old Fidelity to the defendants as defined in § 5101. The Court also held that the promissory notes are to be treated as an "obligation" incurred by Fidelity because although they were originally given to the defendants by FBMC as part of the merger, Fidelity immediately became a co-obligor on the notes.

6. Under §§ 5104(a)(2) and 5105, which are considered the "constructive fraud" provisions of the PUFTA, Fidelity must first prove that it did not receive "reasonably equivalent value" in return for making the distribution and incurring the obligation evidenced by the promissory notes. After considering what Fidelity gave up and what it received that could benefit creditors, and whether it derived indirect economic benefits in exchange for the distribution and/or the obligation under the promissory notes, the Bankruptcy Court held that Fidelity did not receive reasonably equivalent value.

7. A district court reviews a bankruptcy court's findings of fact for clear error; and, legal conclusions are subject to plenary review. *In re Myers*, 491 F.3d 120, 124–25 (3d Cir. 2007); *In re Udell*, 454 F.3d 180, 183 (3d Cir.2006); *IRS v. Pransky*, 318 F.3d 536, 542 (3d Cir.2003).

Fidelity also contends that several of the Bankruptcy Court's factual findings were erroneous, specifically, that: (1) Fidelity had failed to prove that it had been left with unreasonably small assets for the business or would have had an inability to pay debts going forward, claiming that the Bankruptcy Court ignored uncontroverted evidence that showed that Fidelity's demise was reasonably foreseeable on the day the distribution was made and the promissory notes were given; (2) Fidelity was paying its debts as they became due; and, (3) the projections relied upon to support the cash distribution and the promissory notes were not unreasonable. These findings may be disturbed only if they are clearly erroneous.[8]

## IV. Discussion

The statutory framework governing fraudulent transfers in Pennsylvania has undergone an evolution, starting in 1921 and culminating in 1993. Whether the burden of proving constructive fraud changed during this evolutionary process is the issue here. Fidelity contends that it did not, and the defendants that it did.

Resolving the burden of proof issue invites a comparison of the old and the new statutes, and the similar Bankruptcy Code provision which informed the state legislative process that resulted in the 1993 statute.[9] The Pennsylvania Uniform Fraudulent Conveyance Act, 39 P.S. §§ 351–363 (repealed) ("PUFCA"), enacted in 1921, was identical to the Uniform Fraudulent Conveyance Act after which it was modeled. In 1993, the Pennsylvania Uniform

Fraudulent Transfer Act ("PUFTA") replaced the PUFCA.[10] The new statute's provisions covering constructive fraud, sections 5104(a)(2) and 5105, are similar to the corresponding provisions in the earlier statute it replaced.[11] After the PUFCA and before the PUFTA were enacted, Section 548 of the Bankruptcy Code was passed in 1978. The language in the constructive fraud provisions of the later enacted PUFTA closely resembles the statutory language of the Bankruptcy Code constructive fraud provision, 11 U.S.C. § 548(a)(1)(B).

### A. Statutory Framework Under the PUFTA

The pertinent constructive fraud provisions in the current statute are found in sections 5104(a)(2) and 5105. Section 5104(a) of the PUFTA states:

**5104. Transfers fraudulent as to present and future creditors**

(a) **General rule.** A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

. . .

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor

---

**8.** *In re Myers,* 491 F.3d at 124–26.

**9.** The respective statutory provisions of the PUFCA and the Bankruptcy Code are set out in the Appendix.

**10.** *See* 12 Pa.C.S. § 5101, Committee Cmt.— 1993, No. (1).

**11.** Specifically, § 5104(a)(2)(i) of the PUFTA closely resembles 39 P.S. § 355; § 5104(a)(2)(ii) is very similar to § 356; § 5105 is like § 354; and § 5104(a)(1), the PUFTA's actual fraud provision, is similar to § 357.

were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Section 5105 states:

**5105. Transfers fraudulent as to present creditors**

A transfer made or obligation incurred by a debtor as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the that time, or the debtor became insolvent as a result of the transfer or obligation.

12 Pa.C.S.A. §§ 5104, 5105.

Under the PUFTA's constructive fraud provisions, the first question was whether Fidelity had received "reasonably equivalent value" in consideration for the cash distribution and the promissory notes. The Bankruptcy Court concluded that it had not. However, that finding did not end the inquiry. The next step in the fraudulent transfer analysis was to determine whether:

(1) Fidelity was insolvent at the time of the transfer or became insolvent because of the transfer (§ 5105); or

(2) its remaining assets were unreasonably small in relation to the business in which it was engaged (§ 5104(a)(2)(i)); or

(3) Fidelity reasonably should have believed that it would incur debts beyond

its ability to pay as they became due (§ 5104(a)(2)(ii)).

*B. Burden of Proof on the PUFTA claims*

■ The Bankruptcy Court ruled that Fidelity had the burden of proving all elements of its constructive fraud claims brought under sections 5104(a)(2) and 5105 of the PUFTA by a preponderance of the evidence.[12] Fidelity contends that the Bankruptcy Court applied the wrong standard of proof because the defendants, rather than New Fidelity, should have had the burden of proving by clear and convincing evidence that Fidelity had not been left with unreasonably small assets or had been able to pay its debts.

Under the PUFCA, the burden of proof did shift to the party defending the transfer. When examining constructive fraud claims brought under the later repealed statute, Pennsylvania courts had consistently held that if the person conveying the property was in debt at the time the conveyance was made, the burden shifted to the grantee to establish by clear and convincing evidence that the grantor was solvent. *Butler County v. Brocker,* 455 Pa. 343, 314 A.2d 265, 268 (1974); *First Nat'l Bank of Marietta v. Hoffines,* 429 Pa. 109, 239 A.2d 458, 462 (1968); *American Trust Co. v. Kaufman,* 287 Pa. 461, 135 A. 210, 213 (1926); *In re Dalley's Assigned Estate,* 200 Pa. 140, 49 A. 755, 756 (1901); *Coscia v. Hendrie,* 427 Pa.Super. 585, 629 A.2d 1024,1026 (1993); *Elliott v. Kiesewetter,* 98 F.3d 47, 56–57 and n. 6 (3d Cir.1996). However, there are no Pennsylvania court decisions construing the burden of proof in fraudulent transfer cases under the PUFTA.

---

**12.** The Bankruptcy Court issued its ruling at the start of the trial from the bench. *See Trial Transcript,* April 9, 2001 at 59–68.

Because there is no case law fixing the burden of proof in constructive fraud claims under the PUFTA does not mean that cases construing the earlier PUFCA dictate the standard. On the contrary, the drafters of the PUFTA deliberately chose not to adopt prior Pennsylvania law shifting the burden of proof in constructive fraud cases.

The text of the PUFTA, like that of the PUFCA, is silent on the issue of the burden of proof for constructive fraud claims. However, the statute's legislative history is not. It instructs that the burden of proof in constructive fraud claims brought under the PUFTA remains on the party challenging the transfer.

The drafters of the PUFTA, aware of the prior Pennsylvania law regarding burden shifting on constructive fraud claims, rejected it. Committee Comment (6) to section 5102 states:

> Neither this chapter nor these comments comprehensively address such evidentiary and procedural matters as the standard of proof required to establish particular facts, allocation of the burden of proof and burden of persuasion, and the circumstances in which such burdens may shift. Certain specific points are addressed. See, e.g., subsection (b) [to § 5102], Comment 5 to 12 Pa.C.S. § 5104, and Comments 1 and 6 to 12 Pa.C.S.A. § 5108. Except for points specifically addressed, these matters are left to the courts to determine, giving appropriate consideration to, among other things, the policy of construing uniform laws to make uniform the laws of those states which have enacted similar uniform laws (as set forth in 1 Pa.C.S. § 1927 and in the transitional provisions of the act enacting this chapter), the

possible desirability of conformity with similar provisions of the Bankruptcy Code and, to the extent not inconsistent with this chapter, prior Pennsylvania case law. However, *certain cases applying prior Pennsylvania law have stated in effect (if rephrased in the terms used in this chapter) that if a creditor establishes that the transferor was in debt at the time of a transfer, the burden shifts to the parties seeking to uphold the transfer to establish that the transferor received reasonably equivalent value or met the financial conditions required by 12 Pa. C.S. §§ 5104(a)(2) and 5105.* Stinner v. Stinner, 300 Pa.Super. 351, 446 A.2d 651 (1982); In re Glenn, 108 Bankr. 70 (Bankr.W.D.Pa.1989). *That principle is an archaism and has not been consistently followed* (compare, e.g., In re Joshua Slocum, Ltd., 103 Bankr. 610 (Bankr.E.D.Pa.1989), aff'd mem., 121 Bankr. 442 (E.D.Pa.1989)), *and in any event should not be followed in applying this chapter.*

12 Pa.C.S.A. § 5102, Committee Cmt.—1993, No. (6) (emphases supplied).[13] Hence, declaring that the prior Pennsylvania case law shifting the burden to the party seeking to uphold the transfer is no longer applicable in constructive fraud cases, the drafters specifically intended the new statute to depart from prior law.

As Committee Comment (1) to 12 Pa. C.S.A. § 5101 explains, the comments are part of the legislative history of the PUFTA. The statute and the comments:

> were drafted by a committee (the "Committee") of the Section on Corporation, Banking and Business Law of the Pennsylvania Bar Association, with the assis-

---

**13.** Comment (8) to § 5102 notes that Comment (6) is a nonuniform addition, meaning that the comment does not repeat the Uni-form Law Commissioners' comments to the corresponding provision of the Uniform UFTA.

tance of the Joint State Government Commission. *The comments are part of the legislative history of [the PUFTA] . . . .* The comments are adapted from, and in large part repeat, the Uniform Law Commissioners' comments to the Uniform UFTA.[14]

12 Pa.C.S.A. § 5101, Committee Cmt.— 1993, No. (1) (emphasis supplied). Thus, because the Committee Comments were written by the drafters of the PUFTA in connection with the enactment of the statute and the Legislature had access to them prior to passing the legislation, the comments inform the meaning and operation of the PUFTA's provisions.

Fidelity argues that if the Pennsylvania legislature had intended to alter the long-standing common-law allocation of the burden of proof, it would have done so explicitly in the text of the statute, as it did in section 5102(b).[15] On the contrary, when the drafters intended to create specific presumptions or defenses shifting the burden of proof from the party challenging the transfer to the defendant as they did in sections 5102(b), 5104(b) and 5108(a), and the corresponding Comments to those sections, those presumptions or defenses were expressly inserted into the text of the statute.[16] Consequently, when they did not intend to shift the burden of proof, they did not include such a provision in the text of the statute. Accordingly, only where the statute expressly provides for a shifting of the burden of proof is there one.

■ Noting that the language of the constructive fraud provisions in the PUFTA and the PUFCA are very similar, Fidelity invokes the principle that Pennsylvania law "presumes that once the highest court has interpreted the law, the General Assembly intends to retain the same construction in subsequent statutes on the

**14.** 1 Pa.C.S.A. § 1939 provides that "[t]he comments or report of the commission, committee, association or other entity which drafted a statute may be consulted in the construction or application of the original provisions of the statute if such comments or report were published or otherwise generally available prior to the consideration of the statute by the General Assembly, but the text of the statute shall control in the event of conflict between its text and such comments or report." *See Lessner v. Rubinson,* 527 Pa. 393, 592 A.2d 678, 680 n. 4 (1991) ("Official comments are to be given weight in the construction of statutes") (*citing* 1 Pa.C.S.A. § 1939; *Young v. Kaye,* 443 Pa. 335, 279 A.2d 759, 765 n. 3 (1971)); *McGowan v. University of Scranton,* 759 F.2d 287, 298 n. 14 (3d Cir.1985) (considering comments of Pennsylvania Bar Association committee that drafted new statute of limitations provisions to construe statute).

**15.** Section 5102(b) provides, *inter alia,* that once the debtor proves that it is not paying its debts as they become due, it is presumed to be insolvent, and the burden of rebutting this presumption of insolvency shifts to the defendant.

**16.** An example of a rebuttable presumption can be found in section 5102(b), which creates a presumption of the debtor's insolvency that may be rebutted. Committee Comment (2) to section 5102(b) explains that this "presumption is established in recognition of the difficulties typically imposed on a creditor in proving insolvency in the bankruptcy sense." An example of a defense clearly delineated in the statute is section 5108(a), which sets forth a good faith defense to a claim alleging actual intent to defraud creditors. Comment (1) to section 5108(a) explains that "the person who invokes this defense carries the burden of establishing good faith and the reasonable equivalence of the consideration exchanged." Section 5104(b), an example of a provision where there is no burden shifting set forth in the text of the statute, states that in determining actual intent under section 5104(a)(1), "consideration may be given" to a nonexclusive list of factors enumerated in section 5104(b). Comment (5) to section 5104(b) clarifies that evidence of one or more of the enumerated factors "does *not* create a presumption that the debtor has made a fraudulent transfer."

same subject matter." [17] While this rule of construction may be applicable in the absence of any other guidance in the meaning of a statutory provision, it does not apply here given the abundance of instruction from the Committee Comments regarding the applicable burden of proof. *See In re Dawley*, 2005 WL 2077074, at *14 (Bankr.E.D.Pa. Aug.10, 2005) (Sigmund, J.)

Committee Comment (6) to section 5102 clearly explains that "*except for points specifically addressed* [in the statute and the Comments], ... evidentiary and procedural matters [such] as the standard of proof required to establish particular facts, allocation of the burden of proof and burden of persuasion, and the circumstances in which such burdens may shift ... are left to the courts to determine." (emphasis supplied) Whether the burden of proof shifts in constructive fraud cases was not left to the courts to decide. Instead, in the same Comment, the Committee specifically prescribed that the burden does not shift.

■ The constructive fraud provisions of the PUFTA and the Bankruptcy Code should be construed and interpreted uniformly because consistency between the two statutes was a goal of those who drafted the PUFTA and who have since interpreted it. When drafting the model Uniform Fraudulent Transfer Act, the authors looked to the federal Bankruptcy Code for guidance. *See* Michael L. Cook and Richard E. Mendales, *The Uniform Fraudulent Transfer Act: An Introductory Critique*, 62 Am. Bankr.L.J. 87, 87 (1988). During the drafting process, the Conference of Commissioners was "influenced" by the "numerous changes [made] in the section of [the Bankruptcy Reform Act of 1978] dealing with fraudulent transfers

and obligations, thereby substantially reducing the correspondence of the provisions of the federal bankruptcy law on fraudulent transfers with the Uniform [Fraudulent Conveyance] Act." *See Prefatory Note* to the Uniform Fraudulent Transfer Act. Indeed, many provisions in the Uniform Fraudulent Transfer Act were modeled on the Bankruptcy Code, including: definitions of insolvency and when a transfer is made or obligation incurred; where reasonably equivalent value is required to constitute adequate consideration; when good faith defenses apply; and defenses against avoidance of a preferential transfer to an insider. *See id.* Significantly, reflecting their source, the constructive fraud provisions of the PUFTA that are at issue here are virtually identical to the constructive fraud provisions of section 548(a)(1)(B)(i)(ii) of the Bankruptcy Code. *Compare* § 548(a)(1)(B)(ii)(II) *with* § 5104(a)(2)(i); § 548(a)(1)(B)(ii)(III) *with* § 5104(a)(2)(ii); and § 548(a)(1)(B)(ii)(I) *with* § 5105. [18]

In Comment (6) to Section 5102, the Committee expressed its goal of achieving conformity with the Bankruptcy Code in the treatment of evidentiary issues. The Committee encouraged courts to give "appropriate consideration to, among other things, ... the possible desirability of conformity with similar provisions of the Bankruptcy Code" when determining burden of proof issues not addressed in the text of the statute. Later in the same Comment, the Committee concluded that shifting the burden of proof to the party seeking to uphold the transfer is archaic and has not been consistently followed, citing *In re Joshua Slocum, Ltd.*, 103 B.R. 610, 620 (Bankr.E.D.Pa.1989), a case where the court noted the inconsistent

---

**17.** *Pl.'s Reply Br.* at 3–4 (*citing Fonner v. Shandon, Inc.*, 555 Pa. 370, 724 A.2d 903, 906 (1999)).

**18.** *See Appendix.*

standards of the burden of proof in constructive fraud actions brought under the PUFCA and those under section 548 of the Bankruptcy Code as irrational.

■ Federal courts, including the Third Circuit, have consistently held that the party challenging a transfer as fraudulent carries the burden of proving by a preponderance of the evidence all elements of a constructive fraud claim brought under Section 548 of the Bankruptcy Code. *See, e.g., BFP v. RTC,* 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); *In re R.M.L., Inc.,* 92 F.3d 139, 144 (3d Cir. 1996); *Mellon v. Metro Comm's, Inc.,* 945 F.2d 635, 648 (3d Cir.1991). Because the drafters of the PUFTA intended the constructive fraud provisions of the PUFTA and the Bankruptcy Code to be applied uniformly and consistently, the burden of proof should be treated identically. *See In re C.F. Foods, L.P.,* 280 B.R. 103, 115 and n. 27 (Bankr.E.D.Pa.2002) (uniform interpretation of the two virtually identical statutes is essential to promote commerce nationally) (*citing Moody v. Sec. Pacific Bus. Credit, Inc.,* 971 F.2d 1056, 1067–68 (3d Cir.1992)).

Fidelity argues that despite the legislative history and the goal of consistency with the Bankruptcy Code, the court should not disregard more than a century of case law because the rationale for burden-shifting remains the same today as it did when the PUFCA was in effect. Fidelity contends that the purpose of the fraudulent transfer laws is to protect creditors, who were not parties to the transfers at issue and typically lack access to evidence necessary to prove fraud. Fidelity is essentially asking the court to ignore clear legislative intent in favor of prior case law construing a repealed statute.

The drafters of the PUFTA were cognizant of earlier case law. Considering and characterizing the burden shifting as an

"archaism," they rejected the historical application of the burden in constructive fraud cases, dictating that it "should not be followed." *See* 12 Pa.C.S.A. § 5102, Committee Cmt.—1993, No. (6). This determination, which was informed by the Bankruptcy Code, has worked in the bankruptcy context since Section 548 was adopted in 1978.

Finally, Fidelity cites unnecessary language in the Third Circuit's decision in *In re Blatstein,* 192 F.3d 88 (3d Cir.1999) ("*Blatstein IV*"), where the court suggested that the burden of proof was the same under the PUFTA as the PUFCA. Because the Third Circuit's decision in that case turned on the issue of *actual* fraud and the court did not rule on the district court's disposition of the trustee's *constructive* fraud claims, the comment about the burden of proof in constructive fraud cases under the PUFTA is dicta. Indeed, the *Blatstein IV* Court cautioned that its remarks were "not necessary for [the] result." *Id.* at 98.

In *Blatstein IV,* a creditor brought claims against the debtor under the PUFTA's actual fraud provision, section 5104(a)(1), and its constructive fraud provision concerning insolvency, section 5105. The creditor appealed the bankruptcy court's determination that the debtor did not possess actual intent to defraud his creditors when he issued stock in his wife's name and made deposits to her personal accounts. *Id.* at 95. The creditor also challenged the bankruptcy court's conclusion that it had failed to prove that the debtor was insolvent at the time of the transfers at issue, arguing that the burden should have been placed on the grantee-wife to prove that her husband was solvent at the time of the transfers or that she gave him reasonably equivalent value for

the transfers. *Id.* at 96.[19]

The court determined that the bankruptcy court's finding that the debtor did not transfer his income to his wife was clearly erroneous, which, along with other factual findings, demonstrated that the debtor possessed actual intent to defraud his creditors. Therefore, the court held that the bankruptcy court's determination that the debtor did not have the actual intent to defraud his creditors was erroneous. *Id.* at 97–98.

After reaching this holding, the court stated:

> Furthermore, *although not necessary for our result,* we note that the bankruptcy court erred in its "constructive fraud" analysis by incorrectly placing on [the creditor] the burden of proving that reasonably equivalent value was not given for the transfer ... In fact, if the grantor is in debt at the time of a transfer PUFTA places *on the grantee* the burden of proving by clear and convincing evidence that either the grantor was solvent at the time of the transfer or that the grantee had given reasonably equivalent value for the conveyance. *See Elliott v. Kiesewetter,* 98 F.3d 47, 56–57 (3d Cir.1996).
>
> . . . .
>
> ... Without shifting the burden of proof to [his wife] on the consideration issue, the bankruptcy court could not make a proper ruling on the point. Nevertheless, *in light of our holding that [the debtor] possessed an actual intent to defraud his creditors, it is not necessary for us to remand for consideration of the income transfers under the constructive fraud provisions of the PUFTA.*

*Id.* at 98–99 (emphases supplied).

Twice the court expressly stated that its discussion on the constructive fraud claim was "not necessary for our result," thus rendering it dicta and not binding.[20] The case that the *Blatstein* Court cited where it discussed the shifting burden of proof under the PUFTA, *Elliott v. Kiesewetter,* 98 F.3d 47 (3d Cir.1996), does not stand for the proposition that the burden of proof is the same under the PUFTA as it was under the PUFCA. The *Elliott* court shifted the burden to the grantee in that case because the provisions of the PUFCA governed the plaintiff's claims. Although *Elliott* was decided after the PUFTA was enacted, and the *Elliott* Court noted that the PUFCA was "repealed and re-enacted as" the PUFTA, it concluded that the provisions of the PUFCA governed the plaintiff's claims because the transfers at issue took place when the PUFCA was still in effect. *Id.* at 57 n. 6. The court in *Blatstein IV* apparently read the *Elliott* decision as applying the PUFTA, rather than the repealed statute, to the plaintiff's claims when it had not. Thus, *Blatstein IV* neither governs the issue nor supports Fidelity's position.

In sum, the PUFTA's legislative history and the stated goal of consistency with the Bankruptcy Code lead to the conclusion that the burden of proof in constructive fraud cases under the PUFTA remains with the party challenging the transfer.

**19.** In stating the PUFTA provisions at issue, the court set forth the text from § 5104(a)(1) (actual fraud) and § 5105 (balance sheet insolvency/constructive fraud), but only cited to § 5104. *Id.* at 96.

**20.** Moreover, the district court that considered a later appeal in that case characterized this portion of *Blatstein IV* as dicta. *See In re Blatstein,* 260 B.R. 698, 715–16 (E.D.Pa.2001) (Yohn, J.) (noting that language in *Blatstein IV* was dicta in context of a "law of the case" analysis).

Therefore, the Bankruptcy Court's ruling on the burden of proof was correct.

### C. The Bankruptcy Court's Findings Supporting the Conclusion that Fidelity Failed to Prove a Fraudulent Transfer Claim Were Not Clearly Erroneous

■ There is no basis to conclude that the Bankruptcy Court was clearly wrong in its findings.[21] Each of the Bankruptcy Court's specific factual findings are supported by the record. Therefore, the Bankruptcy Court's findings of fact may not be disturbed.

Fidelity contends that the Bankruptcy Court erred in finding that it had not proven either that the company had been left with "unreasonably small assets" in relation to the business of originating and servicing mortgage loans, or that it would have had an "inability to pay its debts" as they became due. It argues that the evidence clearly demonstrates otherwise. It maintains that after making the cash distribution and issuing the promissory notes to the defendants, the defendants, the sole shareholders and directors of Fidelity, should have foreseen that the company would be left with insufficient assets in relation to the business in which New Fidelity was about to engage and that it would not be able to pay its debts, particularly the Summit loan.

■ The unreasonably small assets test set forth in § 5104(a)(2)(i) of the PUFTA denotes a financial condition short of insolvency. It considers whether the transfer rendered the debtor unable "to generate sufficient profits to sustain operations." *Moody*, 971 F.2d 1056, 1070 (3d Cir.1992).

Fidelity argues that the projections relied on by the parties to the merger were flawed in that they were not based on accurate assumptions, not firmly anchored in historical data, and failed to take into account difficulties that were likely to arise. The alleged inaccurate assumptions include the value of Fidelity's mortgage servicing portfolio, the multiplier that would be used to value the portfolio by Summit, and the runoff rate. Additionally, Fidelity argues that even assuming these three key assumptions had been reasonable, Fidelity still would not have had sufficient assets to survive.

#### 1. The Projections

During the negotiations, the parties to the merger prepared annualized projections for the first five years of New Fidelity's operation. Over a nine-month period, employing independent public accountants

---

**21.** The district court may not engage in independent fact finding. *Nantucket Investors II v. Cal. Federal Bank*, 61 F.3d 197, 210 n. 19 (3d Cir.1995) (*citing* 28 U.S.C. § 158(a)). On appeal, a bankruptcy judge's factual findings, whether based on oral or documentary evidence, may be set aside only if they are clearly erroneous. Fed. R. Bankr.P. 8013. A finding of fact is clearly erroneous when the reviewing court is firmly convinced, based on all the evidence, that the trial court made a mistake. *United States v. Perez*, 280 F.3d 318, 351 (3d Cir.2002); Fed. R. Bankr.P. 8013 (according the same weight to a bankruptcy judge's findings as to the findings of a district judge under Fed.R.Civ.P. 52(a)). In reviewing the findings, the district court must give due regard to the bankruptcy judge's opportunity to observe the demeanor and credibility of witnesses, including that of conflicting expert witnesses. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *In re Myers*, 491 F.3d 120, 125–26 (3d Cir.2007) ("bankruptcy court is best positioned to assess the facts, particularly those related to credibility and purpose"); *Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1216 (3d Cir.1993); *Moore's Federal Practice*, § 52.31[5] (3d ed.2006) (sitting without a jury, the trial judge may resolve issues by weighing the credibility of conflicting expert witnesses).

and attorneys, Fidelity, Phoenix and First Republic prepared extensive projections of expected financial performance and the condition of the companies, and scrutinized the assumptions underlying the projections. The due diligence consisted of reviewing and analyzing Fidelity's historical operations, Phoenix's financial history, margins on originations, service fees and ancillary income on the servicing portfolio, staffing and costs associated with overhead, the efficiencies and synergies of combining operations into one centralized location, and other information.

Fidelity contends that most, if not all, of the assumptions upon which the projections were based were incorrect. It claims that the projections did not accurately reflect the true nature of the companies being merged, and did not adequately prepare for the foreseeable and likely difficulties that ultimately occurred.

 The test for determining whether parties to a leveraged buy-out left a business with unreasonably small assets is whether it was reasonably foreseeable that an acquisition would fail at the time the projections were made. *Moody*, 971 F.2d at 1073. A "court must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made." *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Srvs. Co.*, 910 F.Supp. 913, 944 (S.D.N.Y.1995).

(a) *Opening net worth*

Fidelity argues that the projections assumed too great an initial net worth. Specifically, it points to the final projection formulated ten days before the merger which assumed an opening net worth of $3,925,420, which the parties reduced to $3,500,000 on the day of the merger. A subsequent audit fixed the actual net worth at closing at $3,084,370.

The Bankruptcy Court found the projection reasonable because: (1) the actual net worth fell between $2,500,000 and $4,500,000, the range contemplated by the parties to take into consideration varying economic conditions; and (2) the parties' agreement had a mechanism that required the defendants to adjust the price if the net worth was less than anticipated.

Fidelity argues that the Bankruptcy Court's rationale was wrong because the price adjusting mechanism was not designed to increase Fidelity's net worth, but to ensure that First Republic owned 47% of the new company and the defendants owned no more than 20%. In the event the net worth was lower than $ 3.5 million, the defendants were required to refund the difference to Fidelity, which had to pass it on to First Republic and Ronald White. The defendants' response is that the repayment of the equity differential would have appeared as "neutral" because the repayment was carried as both an asset and a liability on Fidelity's balance sheet.

It is not fatal to the Bankruptcy Court's ultimate finding on the issue that the price adjustment was only a mechanism for adjusting the ownership ratios in the new company. It does demonstrate that the parties to the merger anticipated a difference. Thus, because the actual net worth did fall within the parameters fixed by the parties to the merger, the Bankruptcy Court's finding of reasonableness of the projection of Fidelity's opening net worth was not clearly erroneous.

(b) *The projections based on objective historical data*

Fidelity also argues that the projections were not based on objective historical data or the performances of Phoenix and Fidelity. It contends that although Fidelity had

"not earned a profit for over a decade, and Phoenix had earned a profit in only two of the previous four years," the projections assumed that New Fidelity would immediately be profitable and increase its portfolio to over $1 billion in the first five years.

Aside from the fact that the profit history was known prior to the merger, the record shows that the financial condition of both Old Fidelity and Phoenix was not as bleak as Fidelity now portrays. In the four years preceding the merger, according to experts on both sides, Fidelity had generated approximately $4 million in tax losses and $4 million in positive cash flow from operations, reduced its bank debts and payables by an aggregate of $2 million, and increased its receivables. Phoenix had begun improving during 1997, when it turned losses in the first half of the year into profits in the second half, and was predicting a 75–100% increase in loan originations.

More importantly, the anticipated synergies of the combined entities, the size of the new company and the lower administrative costs made these projections reasonable. It was this marriage of two mortgage companies with complementary strengths that the parties saw as the key to success. Fidelity concedes that "in theory, combining a mortgage servicer and a mortgage originator creates greater stability as both sides of the business experience offsetting ebbs and flows" caused by changing interest rates.

In crediting the testimony of the defendants' expert over that of Fidelity's expert,[22] the Bankruptcy Court found that the projections were based on historically accurate data. Specifically, it found that the parties had "used excruciating detail which showed they considered each of the aspects that was involved in this business from a cash basis, from a tax basis, from a principal payment basis, from a loan covenant basis, and how it would affect assets." It concluded that the "parties' careful due diligence" was "based on history and attention to detail that went into projecting figures" that "resulted in a very reasonable, thought-out business plan."[23]

Fidelity criticizes the Bankruptcy Court for failing to consider that Phoenix was facing closing its business because it lost approval to originate HUD-backed mortgages, which made up a significant part of its business, that the defendants had been trying to sell the company for two years before its portfolio disappeared, and that First Republic was a novice at the mortgage banking business.

A party's motivation to complete a transaction does not necessarily make projections unreasonable. Phoenix began improving financially during the year prior to the merger, which is more relevant to the reasonableness of the projection than its loss of business two years earlier. Nor does a party's inexperience in the business render its opinion as to the prospects of the company void or worthless. In any event, the Bankruptcy Court does not appear to have accorded much, if any, weight to First Republic's opinion about the viability of the merged company. It noted that First Republic had not been involved

---

**22.** The Bankruptcy Court noted that in evaluating the conflicting expert opinions on the reasonableness of the projections, Greenspan's testimony and opinion are entitled to more weight because, "[a]mong other reasons, Greenspan's qualifications show significantly more experience in the mortgage banking industry than Miller's." *Op.* at 45 n. 38.

**23.** Indeed, Miller did not review all of the projections, relying solely on the March 25, 1998 projections, and failed to acknowledge that Phoenix had turned losses in the first half of 1997 into gains in the second half.

in creating the projections. It had only reviewed them and made suggestions as to changes.

The Bankruptcy Court considered all of the relevant evidence, lay and expert, in making its finding that the projections were based on historically accurate data. There is ample evidence to support the finding that the data was reasonable. Therefore, this finding was not clearly erroneous.

(c) *The projected value of the unpaid principal balance of the mortgage servicing portfolio, multiplier and runoff rate*

Fidelity argues that the projections failed to measure appropriately the value of the mortgage servicing portfolio, the rate at which the mortgage servicing portfolio decreased (the runoff rate), and the multiplier used to estimate the portfolio's sale value. These numbers were vital to assuring Fidelity's compliance with the terms of the Summit loan.

First, Fidelity asserts that the projections assumed that Old Fidelity's mortgage servicing portfolio had an unpaid principal balance of no less than $577,326,513, but the actual balance of the combined portfolio on the first day of the merger was $565,970,269, almost $12 million less. The Bankruptcy Court found that the projection was reasonable because: (1) the opening balance for the mortgage servicing portfolio was based on historical data and runoff rates; (2) the actual unpaid principal balance of the portfolio as of the closing date fell within the range set by the parties; and (3) the difference of less than $12 million between the projected and the actual combined portfolios would not have

had a substantial impact on the debtor's ability to operate. The parties anticipated that the origination arm of the company would be the primary source of cash flow, generating monthly origination income of $800,000 compared to servicing revenue of $150,000 per month. Therefore, the Bankruptcy Court's findings that a decrease in the portfolio's servicing income as a result of a diminished portfolio would not have significantly affected the company's ability to operate was not clearly erroneous.

Second, Fidelity contends that the projections unreasonably assumed that the existing mortgage servicing portfolio would have a runoff rate of 12.5% per year, when the actual rate of Fidelity's portfolio runoff had been 16–20% in 1997 and between 20–23%, annualized, during the first three months of 1998. The Bankruptcy Court found that the 12% runoff rate projection was reasonable at the time it was made because: (1) it was calculated using the Public Securities Association Standard Prepayment Model; (2) interest rates were stabilizing in the first four months of 1998 after dropping in December 1997 and January 1998,[24] which indicated that the high payoff rate of loans that had fueled the increased runoff rate would slow down; and (3) earlier drafts of the projections had set a lower runoff rate, which the parties increased based on the Prestwick evaluation. The origination arm can generate more new mortgages to offset or outpace the number of mortgages refinanced out of the servicing portfolio, thereby decreasing the runoff rate. Hence, even though the runoff rate was increasing immediately before the merger, a mortgage servicer with a strong mortgage origination arm could actually in-

---

24. The Bankruptcy Court also found that "the presumption of stable interest rates in the Projections was consistent with the interest rate environment in the four months prior to the Merger ... [and that] the drop in rates that occurred in June 1998 and thereafter was not something that the parties could have predicted." *Op.* at 43, ¶ (d).

crease its servicing portfolio—the scenario envisioned by the parties to the merger.

Third, Fidelity argues that the parties' use of a 1.5% multiplier to value the unpaid principal balances rather than the 1.44% multiplier chosen by Summit was unreasonable because it was based on the best price that a willing third-party buyer with an efficient mortgage servicing operation might pay for the portfolio. The Bankruptcy Court found that "although Summit Bank used what might be viewed as a more conservative multiplier for lending purposes, it does not render the parties' agreement as to valuation unreasonable at the time the projections were prepared." Indeed, First Republic agreed that a valuation using a 1.5% multiplier was "consistent with the business environment and previous valuation report." Thus, the Bankruptcy Court's findings that the projections for the opening balance of the mortgage servicing portfolio projection, the runoff rate and the multiplier were reasonable and were not clearly erroneous.

(d) *The projections that Fidelity would have cash reserves of $500,000 and a $500,000 line of credit to operate*

Fidelity argues that the projection that it would, at the closing, have cash reserves of $500,000 and a $500,000 line of credit to operate was not reasonable because it did not have access to the $500,000 Summit line of credit until September 1998 and the amount of cash in reserves fell immediately from $611,918 to $312,000 on the day of the merger. The Bankruptcy Court determined that Fidelity did have more than $500,000 in cash on the day of the merger. Specifically, it had $611,000. Even after paying the Summit loan origination fee of $70,000, New Fidelity retained cash in the amount of $541,000. Although Fidelity had to utilize a significant portion of the available cash shortly after the merger to pay a Phoenix pre-merger payroll and to bring Phoenix's escrows into compliance with federal guidelines, the Bankruptcy Court found that the immediate reduction in cash did not render the projections unreasonable at the time they were made. The payments made immediately after closing were not unforeseen.

With respect to the availability of the $500,000 line of credit, the Bankruptcy Court acknowledged that the Summit line was not available until September 1998. Nevertheless, it found that the parties did not anticipate a need to draw on the line of credit during the first year, and that the line of credit was a backup to insure that the company could pay its debts as they matured. In actuality, when Fidelity drew down the line of credit in September 1998, it merely held the funds as a "safety net." Therefore, because New Fidelity had enough cash reserves on the day of the merger's closing to meet its projections, and because the company did not actually need to draw on the $500,000 line of credit until six months after the merger, the Bankruptcy Court's findings that these projections were reasonable were not clearly erroneous.

(e) *The projections that an increased mortgage origination rate could occur at the same time as a decrease in the mortgage servicing portfolio runoff*

Fidelity argues that the projections called for an "unprecedented rate" of mortgage originations to occur at the same time as a "sudden drop" in the runoff rate because while originators benefit when interest rates fall, servicers suffer because borrowers refinance, causing mortgages to be removed from the portfolio. Fidelity concedes that it met the projections' goal to originate $30 million in mortgage loans

per month in the first year, "far outstripping the volume of originations that Phoenix had ever achieved," but claims that the same economic conditions that helped the origination rate led to the runoff rate that was well over the predicted 12.5% rate.

The projections did not unreasonably assume the simultaneous existence of two offsetting economic conditions. Indeed, it was what the parties had hoped would happen. It was the goal of merging the two mortgage companies to mitigate the effect of changing interest rates. A mortgage servicer that has a strong mortgage origination arm can increase its servicing portfolio when the origination arm generates more new mortgages than the number refinanced out of the servicing portfolio. Moreover, the unpredictable economic crises in other parts of the world were significant contributors to Fidelity's experiencing a higher runoff rate, having to use a lower multiplier, and writing-down its loan servicing portfolio.

The projections were just that–prognostications. The parties had a full opportunity to review and assess the projections and the assumptions upon which they were based. There is no claim that the defendants intentionally misrepresented the facts in the face of evidence to the contrary. Because the business did not turn out as had been predicted does not mean that the predictions were unreasonable. Nor do unanticipated conditions that contributed to the failure of Fidelity render the projections unreasonable.

### (f) *Subsequent unpredictable events*

The Bankruptcy Court found that Fidelity encountered serious financial difficulties after the merger as a result of unforeseen economic events and its own deviation from the business plan. First, it determined that the new company deviated substantially from its business plan and the projections by expanding the business in ways not contemplated by the projections,[25] and by not consolidating the offices of the merged entities as envisioned. It concluded that these "unplanned expansions drained the debtor's operations post-Merger."[26]

The Bankruptcy Court also found that economic events in other parts of the world leading to the unexpected drop in mortgage interest rates were unforeseeable factors that negatively impacted the company after the merger. Specifically, the Asian Crisis, the Russian Bond Crisis and the Long–Term Capital Market ("LTCM") failure in the Fall of 1998 led to substantially lower interest rates. These global economic changes led to a faster runoff rate for mortgage servicing portfolios, which in turn led to a lowering of the multiplier used to value portfolios. Consequently, between November and December of 1998, Fidelity had to decrease its multiplier to 1.2%, which led to writing down the value of its portfolio by $1,405,000. Although Fidelity's physical assets remained the same, the portfolio decrease reduced the net worth of the company by half.

Fidelity argues that the parties' faulty projections, not events that occurred subsequent to the merger, caused its failure. Specifically, it contends that it still would have had insufficient assets and defaulted on the Summit Loan. Fidelity isolates the impact arising from the new company's

---

**25.** The two non-contemplated expansions done by the debtor were setting up and staffing an office in California to expand its government loan program, and acquiring a subprime loan broker, Eagle Financial.

**26.** *Op.* at 45–46.

embarking on a government loan program, and the acquisition of another business which had not been part of the plan when the projections were made and its failure to consolidate its operations while ignoring the effects of the Asian and Russian Bond Crises and the LTCM failure. In making its findings, on the other hand, the Bankruptcy Court appropriately considered the cumulative effect that all of these post-merger events had, as a whole, on Fidelity's demise.

In concluding that the impact of the premature and more-expensive-than-projected expansions *combined* with the unpredicted global economic crises led to Fidelity's downfall, the Bankruptcy Court relied on the defendants' expert Greenspan over the plaintiff's expert. Accordingly, the Bankruptcy Court's findings in this regard were not erroneous.

### 2. New Fidelity Continued to Operate and Pay Creditors for an Extended Period After the Merger

█ Another factor to consider in the unreasonably small assets test is the length of time a company continued to operate and pay creditors after the disputed transfer. *In re Joy Recovery Technology Corp.*, 286 B.R. 54, 76 (Bankr.N.D.Ill. 2002). Fidelity did not file its bankruptcy petition until more than 14 months after the merger, and made all interest payments due to Summit during that time. During the first eight months of operations (through December 1998), it had a positive monthly cash balance.

█ Courts evaluating the unreasonably small assets test compare the company to others in the industry. *Joy Recovery*, 286 B.R. at 76. The Bankruptcy Judge credited the defendants' expert's opinion that Fidelity operated with ratios similar to industry benchmarks.

There were competing experts, each giving a different opinion using different assumptions. The Bankruptcy Court, as the fact finder, was free to accept all, none or some of each expert's opinions. *Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1216 (3d Cir.1993); *Moore's Federal Practice*, § 52.31[5] (3d ed.2006) (sitting without a jury, the trial judge may resolve issues by weighing the credibility of conflicting expert witnesses). The determination regarding the experts was made in the full context of the facts and after the opportunity to evaluate the credibility and qualifications of the experts. Fidelity's challenge goes to the choice the Bankruptcy Court, the fact finder, made. The factual findings were not clearly erroneous and will not be disturbed.

### 3. The Bankruptcy Court Correctly Determined that the Defendants Did Not Breach Their Fiduciary Duty to New Fidelity When They Authorized the Distribution

Fidelity also challenges the Bankruptcy Court's holding that the defendants were not individually liable under Pennsylvania Business Corporation Law, 15 Pa.C.S.A. §§ 1551(b) and 1553, for leaving the company "unable to pay its debts as they became due in the usual course of business" and that they did not breach their fiduciary duty to New Fidelity under § 1712 when they authorized the distribution. Specifically, it contends that pursuant to 15 Pa.C.S. § 1551 cmt. 2, the directors of a corporation "must make an affirmative inquiry into the affairs of the corporation to determine whether the 'known obligations of the corporation can reasonably be expected to be satisfied over the period of time that they will mature.'" It cites 15 Pa.C.S. § 1712(b) for the proposition that a director acts in bad faith if he has knowledge that "would cause his reli-

ance to be unwarranted." It claims that it established that defendant Stephen Brand had actual knowledge of the portfolio's unpaid principal balance, the multiplier that Summit Bank would use and the real run-off rate. Fidelity then argues that this "actual knowledge" rendered it unreasonable and in bad faith for Brand to rely on information from third parties for the projections.

Based on its findings that Fidelity was not insolvent and was able to pay its debts as they became due in the ordinary course of business as defined in the PUFTA, the Bankruptcy Court held that the distribution to the defendants was not unlawful under § 1551. Because it had determined that the projections were reasonable, the Bankruptcy Court found that the defendants' reliance upon the projections was in good faith. Thus, it held that the defendants did not breach their duty of good faith dealing in accordance with § 1712.

■ On mixed questions of law and fact, I must accept the bankruptcy court's findings of historical or narrative facts unless they are clearly erroneous, but exercise plenary review of the trial court's interpretation of legal precepts and its application of those precepts to the historical facts. *Mellon Bank v. Metro Communications, Inc.*, 945 F.2d 635, 641–42 (3d Cir. 1991).

■ The fiduciary claim under the Pennsylvania Business Corporation Law was dependent on the constructive fraud claim. If there was no fraudulent transfer under the PUFTA, there is no breach of fiduciary duty. Hence, because the Bankruptcy Court based its decision that there was no constructive fraud on facts which were not clearly erroneous, those facts support the decision that the defendants did not breach their fiduciary duty.

## Conclusion

The Bankruptcy Court correctly placed the burden of proving the elements of constructive fraud under the PUFTA on Fidelity, the party asserting a fraudulent transfer. Additionally, its findings that the transfers were not fraudulent and the defendants did not breach their fiduciary duty were not clearly erroneous and are supported by the record. Therefore, the Bankruptcy Court's verdict will be affirmed.

## APPENDIX

*Pennsylvania's Uniform Fraudulent Conveyance Act*

The pertinent provisions of the repealed statute are as follows:

**39 P.S. § 355. Conveyance by persons in business**

Every conveyance made without fair consideration, when the person making it is engaged, or is about to engage, in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors, and as to other persons who become creditors during the continuance of such business or transaction, without regard to actual intent.

**§ 356. Conveyance by a person about to incur debts**

Every conveyance made and every obligation incurred without fair consideration, when the person making the conveyance or entering into the obligation intends or believes that he will incur debt beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

**§ 354. Conveyance by insolvent**

Every conveyance made and every obligation incurred by a person who is or will thereby be rendered insolvent, is

fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

39 P.S. § 355, 356, 354 (repealed).

*§ 548 of the Bankruptcy Code*

Section 548(a)(1)(B) of the Bankruptcy Code provides as follows:

**§ 548. Fraudulent transfers and obligations**

(a)(1) The Trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

———

**(B)(i)** received less than reasonably equivalent value in exchange for such transfer or obligation; and

**(ii)(I)** was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

**(II)** was engaged in business or a transaction, or was about to engage in a business or transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]

**(III)** intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B).

### ORDER

**AND NOW,** this 18th day of July, 2007, upon consideration of the Brief of Appellant Fidelity Bond & Mortgage Company (Document No. 6), the Brief of Appellees (Document No. 12), the Reply Brief of Appellant (Document No. 13), and after review of the record in the Bankruptcy Court, it is **ORDERED** that the Order of the Bankruptcy Court dated April 14, 2006 is **AFFIRMED.**